UNITED STATES *v.* SOMERSET IMPORTERS, LTD. (No. 4509)[1]

[1] C. A. D. 328.

United States Court of Customs and Patent Appeals, March 4, 1946

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument December 6, 1945, by Mr. Donohue and Mr. Schwartz]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This is an appeal by the United States from the judgment of the United States Customs Court, Third Division (C. D. 909), sustaining a claim in appellee's protest for allowance of duties on certain bottles of imported Scotch whisky which were broken after the merchandise had reached the port of New York but while in transit under bond and in customs custody to San Francisco, the port of ultimate destination. It overruled appellee's protest except as to breakage of two or more bottles of a case.

Appellee's protest is stated to be predicated upon the provisions of paragraph 813 of the Tariff Act of 1930, as amended (title 19, U. S. C., 1940 ed., sec. 1001, par. 813), which provides that the collector of customs, at the time of liquidation, may make an allowance for certain losses occurring to alcoholic liquors while in transit from a foreign port.

There is no dispute about the facts and the sole question is one of law, i. e., does the allowance for breakage provision in said paragraph 813 apply to the facts in the instant case.

Five thousand cases of 5 Star Scotch whisky, shipped from Scotland to west coast cities of the United States, arrived at New York on December 20, 1939, on the steamer *Shickshinny*. They were unladen under the supervision of a United States customs inspector, which

unlading was for the purpose of transferring them from one pier to another and then aboard the steamer *Maui* for shipment to the west coast. During all the time the goods were in New York they were in customs custody and while there the customs officials noted no loss except that one bottle in one case was broken and one bottle in another case was missing, 11 full bottles remaining in each case.

When the shipment arrived at Los Angeles the 5,000 cases were unladen under customs supervision. The customs inspector under whose supervision the cases were unladen testified that he found no damaged cases. We will refer to his inspection hereinafter. Two thousand five hundred cases were entered at Los Angeles and 250 were sent from Los Angeles to Portland and Seattle. The remaining 2,250 cases went to San Francisco. Of the 2,250 cases originally consigned to that port, the customs inspector, upon his inspection and examination, found 227 cases stained. The 2,250 cases shipped to San Francisco which were to remain in San Francisco were, after the customs inspector noted the stained cases, delivered to the warehouse, where the clerk in charge established the fact that the importer herein had filed, under said paragraph 813, the required affidavit showing the following breakage:

87 Cases Ea—1 bottle broken
28 Cases Ea—2 bottles broken
6 Cases Ea—3 bottles broken
2 Cases Ea—4 bottles broken
1 Case Ea—5 bottles out

The whisky was shipped from New York under "Immediate Transportation" entry.

No allowance was made by the collector at the port of San Francisco for any of the whisky lost. Customs duties were paid on the entire quantity invoiced, but no internal revenue tax on the lost goods was paid.

It is the position of the Government in this court that the trial court erroneously concluded that paragraph 813 applied to leakage or breakage which occurred subsequent to the landing of the liquor at the port of New York. (It is conceded that the loss occurred subsequent to its arrival within the jurisdiction of the customs authorities at the port of New York.) Government counsel argue that the leakage and breakage of the articles referred to in paragraph 813 for which allowance may be made is only such as occurs while the goods are in transit from a foreign port—in the instant case, in transit from Scotland to New York—and predicate the argument, for the most part, upon the contention that when the goods herein involved arrived within the jurisdiction of the port of New York they had been *imported* and that merchandise "in transit from a foreign port" is merchandise that has not been imported and that "transit" ceases when customs custody begins.

The Government makes the point that in the 1938 amendment of section 315 of the Tariff Act of 1930, hereinafter more particularly referred to, a change was made which involved striking out the words "at the time of its entry" and inserting in lieu thereof "at the time of *importation*." [Italics ours.] A satisfactory answer to this contention as to the implications to be drawn therefrom was pointed out by the trial court and will be referred to hereinafter.

In this court, but apparently not elsewhere, the Government also makes a contention, which we have difficulty in understanding, with reference to the applicability to the instant case of the provisions of section 1563, being section 563 of the Tariff Act of 1930, which section will be more fully discussed hereinafter. At one place in the Government's brief it discusses the possible applicability of section 1563 with the suggestion that if the section does apply the importer has sought the wrong remedy and should have applied for allowance for the loss to the Secretary of the Treasury in accordance with the provisions of that section.

The Government states elsewhere in its brief that the judgment of the trial court holding said paragraph 813 applicable in the instant case "is in conflict with section 1563, which prohibits the allowance for loss of any merchandise in customs custody resulting from casualty."

There is no concession here on the part of the Government that if appellee in the instant case had sought a remedy under section 1563 it could properly have been allowed. The Government's chief contention is that under its construction of the words "in transit from a foreign port" the paragraph is not applicable to the leakage and breakage in the instant case, and that no protest will lie against the loss occurring to the liquor while under bond for transportation and that the trial court and this court have no jurisdiction in the premises and that if allowance is to be made by anyone connected with the Government, for leakage and breakage while goods are in the custody of the Government, it must be under section 1563 where the decision of the Secretary of the Treasury is final.

Paragraph 813 of the Tariff Act of 1930, as amended, reads as follows:

PAR. 813. There shall be no constructive or other allowance for *breakage, leakage, or damage* on wines, liquors, cordials, or distilled spirits, except that when it shall appear to the collector of customs from the gauger's return, verified by an affidavit by the importer to be filed within fifteen days after the delivery of the merchandise, *that a cask or package has been broken or otherwise injured in transit from a foreign port* and as a result thereof a part of its contents, amounting to 10 per centum or more of the total value of the contents of the said cask or package in its condition as exported, has been lost, allowance therefor may be made in the liquidation of the duties. [Italics ours.]

Said section 1563, title 19, U. S. C., 1940 ed., being section 563 of the Tariff Act of 1930, reads as follows:

### SEC. 1563. ALLOWANCE FOR LOSS—ABANDONMENT OF WAREHOUSE GOODS.

(a) ALLOWANCE.—In no case shall there be any abatement or allowance made in the duties for any injury, deterioration, loss or damage sustained by *any merchandise while remaining in customs custody*, except that the Secretary of the Treasury is authorized, upon production of proof satisfactory to him of the *loss or theft* of any merchandise while in the *appraiser's stores*, or of the actual *injury or destruction*, in whole or in part, of any merchandise *by accidental fire or other casualty, while in bonded warehouse, or in the appraiser's stores, or while in transportation under bond, or while in the custody of the officers of the customs, although not in bond*, or while within the limits of any port of entry and before having been landed under the supervision of the officers of the customs, to abate or refund, as the case may be, the duties upon such merchandise, in whole or in part and to pay any such refund out of any moneys in the Treasury not otherwise appropriated, and to cancel any warehouse bond or bonds, or enter satisfaction thereon in whole or in part, as the case may be, but no abatement or refund shall be made in respect of injury or destruction of any merchandise in bonded warehouse occurring after the expiration of three years from the date of importation. The decision of the Secretary of the Treasury as to the abatement or refund of the duties on any such merchandise shall be final and conclusive upon all persons. * * * [Italics ours.]

Other statutory provisions and Treasury regulations which are pertinent to a consideration of the issues presented will be referred to and quoted in the body of the opinion to follow.

The appellee-importer raises several questions, some of which we need not pass upon. Its main contention is that paragraph 813 is a specific provision of law, applicable only to allowances for *breakage, leakage,* or *damage* on the particular alcoholic beverages therein named, and that the allowance there provided for which the collector is required to make in his liquidation and which is therefore subject to protest includes that which results from breakage or injury which occurs anywhere between the foreign port of exportation and the port of destination, which is the port of entry. Its argument on this phase of the question embraces many different pertinent considerations, some of which will be referred to in our holdings hereinafter.

Appellee raises the interesting question here that this court should not consider the applicability of section 1563 since it was not called to the court's attention below, was not considered by it, and is not covered by any assignment of error to this court. We can dispose of this question briefly here. We think this court has a right to consider any paragraph in the tariff act or any other statute enacted by Congress which may throw any light on the proper construction to be given to another paragraph which we are called upon to construe. If it is a legitimate argument to raise here under present circumstances that appellee might have a clear remedy under section 1563 and that Congress would not intend two remedies for the same damage or loss, it surely is pertinent for this court to inquire as to whether or not, under the circumstances, there are two remedies available or if there

is any single remedy available. So we will necessarily be called upon in deciding the issue as to the applicability of paragraph 813 to make some comment with respect to the pertinency of section 1563.

Appellee makes another interesting contention that the Government's construction of paragraph 813, if adopted, would render the provision repugnant to the United States Constitution as not being *uniform throughout the United States* (art. 1, sec. 8, clause 1) and as violative of the *no port preference* provision (art. 1, sec. 9, clause 6), since no remedy for leakage or breakage of liquor from a foreign port would be available to anyone except to those to whom the goods were delivered at the first port of landing, thus discriminating against the citizens of ports where transshipment was required. In view of our conclusion it will not be necessary for us to pass on this novel, interesting, and important question.

While numerous decisions have been cited by the parties to this proceeding none of them involves a holding on the main question presented here except those of the trial court, to which reference will hereinafter be made.

Since the importer contends that customs regulations of long-standing and long-continued administrative practices support the importer's position in this case, we think it important to note somewhat in detail what the facts on this subject really are and to consider also some phases of the legislative history relating to the pertinent statutory provisions involved herein.

From the beginning of the levying of tariff duties on imported alcoholic spirits up to 1854, it was the settled policy of the Government, for reasons which evidently appeared sufficient to it, to make no allowance whatever in the way of refunding tariff duties for leakage, breakage, or loss of alcoholic beverages regardless of how or where it occurred. In 1854 Congress enacted what became section 2984 of the Revised Statutes, which remained the law in the form enacted until 1922, when it was reenacted with slight changes. This provision as it now appears in the Tariff Act of 1930 is section 563 (sec. 1563, U. S. C., cited *supra*).

It will be noticed that this provision first denies any allowance for loss or damage to any merchandise while remaining in customs custody and then provides that upon certain conditions the Secretary of the Treasury may authorize allowances in his discretion for goods damaged or destroyed under certain circumstances. We will point out certain features of this provision later herein.

In the act of 1913 first appeared the provision which is identical with the present paragraph 813 of the Tariff Act of 1930, the construction of which is here in controversy. It for the first time provided *specifically* that if wines, liquors, cordials, or distilled spirits suffered breakage, leakage, or damage by reason of the fact that a

cask or package had been broken or otherwise injured *in transit from a foreign port* the collector might make allowance therefor in his liquidation of duties. Thus we see that with respect to liquors and under the conditions therein specifically named Congress saw fit to put the question of allowance up to the collector rather than to the Secretary of the Treasury but did not provide that it should be within the discretion of the collector. His refusal to make an allowance where it was proper to do so became, therefore, a protestable matter reviewable by the courts.

It will be noticed in that provision that the importer seeking a remedy must file an affidavit within 15 days after the *delivery of the merchandise* and that the allowance is to be made in the *liquidation of the duties*, and that it is to be based upon what appeared to the collector *from the gauger's return*. Of course, the affidavit of the importer could not be made until after the gauger had made his return, because up until then he had no information upon which to act. Moreover, his right to file the affidavit depended upon what appeared to the collector of customs from the gauger's return; obviously whatever action is taken under this provision must be subsequent to the gauger's return.

In accordance with the law the gauger's return was made, and the goods were delivered in the instant case in San Francisco after the goods had arrived there in their shipment from Scotland.

The gauger's return would not necessarily show the amount of breakage or leakage or damage which occurred in the shipment from Scotland to New York because until it came before him no one had the responsibility of measuring leakage or estimating breakage. The return showed how much of such damage there was as appeared from the goods when he gauged them. Whatever act took place in the way of inspection of the goods by customs officials at New York was presumably in the absence of the importer and primarily for the purpose of seeing that none of the goods was diverted from their through shipment to San Francisco at the port of New York. Since the leakage and breakage and other losses, if any, were to be ascertained and considered at the port of final destination the inspector at New York was not required to say how much had leaked from the cask or package— he was not called upon to gauge the amount. He was there in the instant case to see that 5,000 cases, as shown by the invoice and ship's manifest, if they had been landed, were delivered to the bonded carrier.

This is true of the examination that was made of the goods at Los Angeles, as shown by the testimony of the Government witness, Fellowes, inspector at that port, who stated that he made no notations of damage for the reason that he found none. He merely looked at the big pile of cases put in the form of a solid block, more or less square, seven to nine cases high, many cases being unobservable.

He made no other examination and no report as to injury, breakage, or damage. It is obvious that he regarded it as his duty to ascertain from the stack that there were 5,000 cases in the stack and to see that the cases were disposed of in accordance with the transportation order. His duties under the law, as we understand it, were substantially the same as those of the inspector at New York.

The cursory and indifferent inspection which took place at New York, as shown by the testimony in the instant record, was not always followed since all the Treasury Department regulations and instructions which prevailed up to that time (see art. 611, Customs Regulations, 1915, and its successors) had been predicated upon the determination of the amount of breakage and leakage at the time of gauging. If the instant liquor had been in barrels the inspectors at New York and Los Angeles might have reported a leaking barrel if it came to their attention, but there was no obligation on their part to determine the quantity in the barrel. The same is true with cases. As is pointed out in the exhaustive opinion of the trial court by Judge Keefe, the regulations and instructions up to that time were predicated upon the fact that loss would be ascertained at the time of gauging and before delivery of the goods. Delivery, under section 815, Customs Regulations, 1937, was defined as being made either "directly to the importer or to the storekeeper in charge of a bonded warehouse," and allowances for loss were confined to those which had occurred prior to the "gauging of the merchandise."

Said regulations furthermore provided that "when merchandise is forwarded under an immediate transportation entry delivery shall be construed to be effected at the port of destination under the above conditions."

Other regulations, unnecessary to consider here but pointed out in the decision below, show unmistakably that the Treasury Department has always so defined delivery and predicated allowances for certain losses, including leakage and breakage pertaining to liquors (such as that involved here), upon those which occurred *prior to gauging and delivery*.

It is pertinent also to note that section 315 of the Tariff Act of 1930, applying to goods warehoused and merchandise previously imported for which no entry has been made (as here), stated in a proviso:

That *when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse, said duties shall*, except as provided in section 562 of this Act (relating to manipulating warehouses), *be levied and collected upon the weight of such merchandise at the time of its entry.* [Italics not quoted.]

Congress, in the administrative act of 1938, however, struck out the above proviso and inserted in lieu thereof the following:

*Insofar as* duties are based upon the *quantity of any* merchandise, *such* duties shall, except as provided in *paragraph 813* and section 562 of this Act (relating *respec-*

*tively* to *certain beverages* and to manipulating warehouses), be levied and collected upon the *quantity* of such merchandise at the time of its *importation*. [Italicized portion represents new language.]

It will be observed that in the above 1938 amendment Congress, for the first time, uses the words "certain beverages" and requires that duty be levied upon the *quantity* of such merchandise "at the time of importation." Notice also that, as the trial court pointed out, paragraph 813, with which we are here chiefly concerned, *is excepted from the provision* in the same way as is section 562 which provides for taking duty on warehouse manipulated goods on the *quantity* at time of withdrawal.

The Government in its brief, as before stated, points to the word "importation" used in the amendment in its contention that Congress uses the term as meaning when goods have crossed the customs border. But the Government did not in its brief, while on this subject, call this court's attention to the fact that the provision itself exempts paragraph 813. In other words, the quantity of the liquor under paragraph 813 was not to be taken as of the *time of importation* (at the time of crossing the customs border, according to the Government), but as of the time of entry and to be ascertained before delivery at the port of final destination from the gauger's return. If there were ever any doubt as to the meaning of paragraph 813 Congress unquestionably clarified it before the instant goods were imported.

It is difficult to understand all that is implied from the Government's argument based upon the proper definition of the word "importation." If the Government's interpretation of the phrase, "in transit from a foreign port" (which is a new question here), is accepted to mean "from a foreign port until imported or until it crosses the customs border," then we can understand what the Government means by its lengthy contentions concerning the term "imported."

As pertinent to the issue with which we are concerned, neither the words "import," "imported," nor "importation" appear in either one of the two controverted provisions. The Government would have us consider the pertinent part of paragraph 813 as if it read: "In transit from a foreign port to the customs jurisdiction of the United States." This we are not privileged to do because Congress did not insert such language nor do all the facts and circumstances of the case justify the conclusion that it intended the language to be so construed.

In connection with the consideration of the Government's contention with respect to the definition of the word "importation," it is important to recall the fact that under many well-considered cases it has been held that Congress used the term with different meanings. No cited authorities are necessary to recall that the word "importation," for prohibition enforcement purposes, has been declared to

mean when the goods enter the customs border. The same is true with holdings with respect to the time when duties accrue on goods. It has been held that importation, under certain circumstances, means when the goods enter the commerce of the United States. So we must look with caution upon the contention of the Government that merchandise "in transit from a foreign port" means merchandise in transit from the foreign port until it has reached the customs jurisdiction of the United States or is "imported."

The primary question we think involved is whether or not this newer, specific provision, paragraph 813, which gives a remedy for leakage and breakage occurring to casks and packages of alcoholic liquor "while in transit from a foreign port" should be interpreted to include such merchandise lost after the same had reached the customs jurisdiction but before it was finally gauged and delivered.

In deciding this question, it is important to consider the fact that Congress here was seeking to single out alcoholic liquors, which came in casks or packages, from the great array of merchandise being imported into this country, and to authorize the allowance for losses of a certain character which were shown by the gauger's return at the port of delivery. Obviously, the specific provision, paragraph 813, applying to liquor, should prevail in its application to the instant merchandise (if applicable at all) over any general provision such as section 1563 (assuming it also is applicable). In fact, if both provisions applied to the instant facts, under our view of the case it would only be necessary to determine whether paragraph 813 applied, since it is a well-settled principle of law that specific provisions prevail over general ones. *Missouri* v. *Ross*, 299 U. S. 72. This was our definite holding as to said paragraph 813 in the case of *United States* v. *Siegfried Lowenthal Co.*, 31 C. C. P. A. (Customs) 19, 28, C. A. D. 244.

However, as before stated, in determining whether Congress intended the language "in transit from a foreign port" to be applicable in a case like that at bar, it is proper to consider if it in fact did, in the year 1854, provide an adequate remedy for losses under such circumstances as we are considering here, and this involves the question of the applicability of section 1563, which the Government does not concede applies but suggests that if it does apply the importer has elected the wrong remedy. The argument of the Government leads to the conclusion that its counsel do not think Congress afforded any remedy for losses under circumstances like those involved here. This fact is further discussed later herein.

This position, in our judgment, is not in harmony with the legislative history to which we have alluded. Congress sought to relieve the harshness of previous enactments, and there is no plausible reason to believe that it intended to treat importers at ports of final destination where landings had previously been made elsewhere in any way different in respects with which we are here concerned than

importers who were privileged to have delivery of their goods at the first port of landing. It is a settled principle of customs law that the Government should not seek to exact taxes from the importing public upon doubtful constructions of law or where there was a nonimportation. In more recent times Congress has interested itself in giving relief, in certain instances, from tax burdens on alcoholic spirits which were never received by the importer.

While realizing that under well-settled principles of law the importer in this case must bring himself squarely within the exception of paragraph 813 because it grants him the privilege of an exception from a definite prohibition of allowance, it is, however, clearly proper for the court, in construing the provision, to look to the purposes which Congress sought to serve and arrive at a conclusion in harmony therewith, if the language of the legislation being construed permits interpretation.

It is our view that an importation of liquor from Scotland to San Francisco which involved a reloading at New York must be regarded under the circumstances of this case as an importation from Scotland to San Francisco. The destination of the liquor originally was San Francisco; it was either in the hands of the transportation company or the Government from the time it left Scotland until it arrived at San Francisco and was delivered to the importer. The instant shipment is not an importation from New York, nor is it a shipment from New York. As far as the importer's rights are concerned the fact that it was reloaded for shipping convenience was immaterial to him, and for present purposes it should be immaterial to the Government. Nothing in the instant record or in the entire history of Congress' treatment of this question would indicate that it did not intend, by the provisions of paragraph 813, to grant the remedy which in this appeal the importer seeks and which we think was properly awarded in the judgment of the trial court.

The Government seems to have considerable doubt as to whether any remedy is afforded appellee but, as before stated, points out a certain remedy for certain losses is granted in section 1563. The importer suggests that it is not a certain remedy by reason of the provision which entitles one to allowances only for loss occasioned by *"accidental fire or other casualty."* Considerable doubt as to the applicability of that section to the instant merchandise might be entertained by reason of the fact that at the time it was enacted there was a positive prohibition in the statute prohibiting any allowance for loss on liquors. Moreover, a study of the legislative history and the administrative practices with reference to the provisions of section 1563 throws considerable light upon that question, but in view of our conclusion that paragraph 813 is a more specific provision (in respects heretofore indicated), we feel it unnecessary to make a definite holding with respect to the applicability of section 1563 and reserve that

question for future consideration. It is sufficient on this phase of the case to add that if the applicability of section 1563 was a controlling factor, which it is not, there is at least considerable doubt on the question as to whether or not Congress has provided two remedies for the same right, which it sometimes does but ordinarily does not do.

The Government argues, "Adopting appellant's construction, there is no conflict between paragraph 813 and section 1563. The former relates to merchandise which has not yet been imported and hence is not in customs custody. The latter affects only merchandise in customs custody."

If Congress had had in mind making a division of remedies depend upon whether the goods were in customs custody or "in transit" as suggested by the Government, it is a strange thing that when it provided a remedy for loss in transit from a foreign port it did not cover many instances of loss, such as theft, provided for under section 1563 while the goods were in customs custody. Under section 1563 allowance may be had for "loss or theft" sustained by any merchandise, or injury or destruction "by accidental fire or other casualty, while in bonded warehouse * * * or while in transportation under bond," while paragraph 813 only permits allowance for breakage, leakage, or damage to wines, liquors, cordials or distilled spirits, which are ascertained by the gauger and reported by him and sworn to by the importer, and then the allowance is made only in case the cask or package has been broken or otherwise injured in transit from a foreign port—loss from theft is not to be considered, nor is a loss from a leaky package which was leaky when exported.

If Congress was only concerned in paragraph 813 with taking care of losses while in transit to a point within customs jurisdiction and leaving liquor and all other merchandise while in bond to be subject to the provisions of section 1563, it is pertinent to inquire why, in paragraph 813, it did not take care of the same losses which occurred before the goods reached an American port that it took cognizance of afterwards and while under customs custody. Why did it single out liquor? Why did it confine it to damage that had occurred by reason of the *breakage* or *injury* of a package or a cask in transit, and why did it change the jurisdiction from the Secretary of the Treasury to the collector of customs? In the light of these considerations may it properly be said that the Government's construction of the two provisions under consideration brings about a harmonious conclusion?

It is more reasonable to conclude that Congress wished to single liquor out as a special subject for legislation and to provide in definite terms (which, to say the least, is not very definitely stated in section 1563) that the liquors named, if lost during transit to the importer, not by theft, not by fire or other casualty, but by breakage or injury of the cask or package while in transit, the loss should be determined

by the gauger and the collector, and that the importer would have an allowance therefor.

If the Government's view is to be adopted we can easily see where incongruous results would ensue. For instance, what would be the result where a cask of whisky had been exported from Scotland to San Francisco by way of unlading at New York and a large quantity of the liquor had leaked out before it had arrived at New York by reason of a leaky cask, damaged while in transit, and a very large quantity of the remainder leaked out of the same cask after reaching New York and before arriving at San Francisco. It would not be gauged at New York and no one there would be authorized to do anything about it except to see that the barrel was loaded on the other ship. If it was the inspector's duty to note and report that it was leaking this fact for present purposes would be immaterial. The gauger and the collector, when the quantity was ascertained prior to delivery, would have no way of telling what portion of the liquor leaked out before it arrived at New York and what portion leaked out while in transit from New York to San Francisco. The gauger or the collector could make no return or no report that would enable the importer, under paragraph 813, to file an affidavit and proceed as did the importer in the instant case. In other words, the Government's contention, as before stated, leads to the conclusion that under its construction there is no adequate remedy for an importer to obtain an allowance for leakage or breakage while in transit, under paragraph 813, except where delivery is made at the first port of entry or where the gauger and the collector agree and gratuitously report a loss on the high seas which, as before pointed out, they are not supposed to know anything about.

As bearing upon the whole question, we think it not improper to call attention to the manner in which the instant litigation arose.

We have heretofore pointed out the settled practice with reference to losses of liquor such as are herein involved up until September 5, 1941, when the following customs decision, published in T. D. 50481 (77 Treas. Dec. 99), was issued:

*Allowance for breakage, leakage, or damage on alcoholic beverages during transportation.* Allowance under paragraph 813, Tariff Act of 1930, as amended, is limited to breakage, leakage, or damage on wines, liquors, cordials, or distilled spirits occurring "in transit from a foreign port," as held in Abstract 41761. Accordingly, when the shipment has been inspected at the port of first arrival, no allowance can be made for breakage, leakage, or damage occurring during transportation in bond to the port of destination. Abstract 46019 noted. Bureau letter to collector of customs New York, N. Y., dated September 5, 1941 (241.6).

It will be noted that it followed Abstract 41761 rather than Abstract 46019, although it stated that it "noted" the latter decision. Abstract 41761, which the collector followed, was a case decided in 1939 by the same division of the Customs Court, the opinion being written by

152

the same judge as in the instant case, Judge Keefe. That decision is not in harmony with the court's decision in the instant case. The latter referred-to abstract, 46019, *John S. Doane Co.* v. *United States*, 6 Cust. Ct. 673 (decided June 5, 1941), was also from the same division of the Customs Court and the opinion by the same judge as is the instant opinion. The exact question presented here, however, was squarely presented in the case of *Marco Importing Co.* v. *United States*, 7 Cust. Ct. 206, C. D. 569, in December 1941. There the Third Division, with the same judge writing the opinion, went into the case thoroughly and held, apparently in some respects contrary to the first decision in Abstract 41761, that the allowance should be made for the actual breakage or leakage occurring while in transit under immediate transportation entry. No appeal was taken in that case. A new record was made in the instant case, involving, however, substantially the same state of facts, and then the Secretary of the Treasury, in T. D. 50627, issued April 30, 1942, directed that the principle of the decision in the *Marco* case should not be followed, stating that "a similar question is involved in a case now pending before the Customs Court, in which it is hoped to obtain a more complete record."

In the instant decision by the same division of the Customs Court and in an opinion by the same judge, the error of the first decision relied upon by the Treasury Department in its said T. D. 50481 was conceded, and it was pointed out that since Congress in 1938 amended the statute in the particulars heretofore indicated a conclusion different from that arrived at in the first decision was proper and necessary.

We have here an example of an unusual amount of consideration by a division of the Customs Court having been given to a very much involved question, and it is our view that it should not be lightly overturned, and its present decision, for reasons hereinbefore stated, should not be reversed by this court in this appeal.

The judgment of the United States Customs Court, which overruled the importer's protest as to certain losses which the importer does not claim here and sustained the importer's protest as to the breakage specifically mentioned in the judgment, is *affirmed*.